UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PRESTIGE INSTITUTE FOR PLASTIC SURGERY, P.C, and KEITH M. BLECHMAN, M.D., P.C., on behalf of PATIENT HG,<br><br>Plaintiffs,<br><br>v.<br><br>KEYSTONE HEALTHPLAN EAST, BLUE CROSS OF CALIFORNIA d/b/a ANTHEM BLUE CROSS, and SIEMENS CORPORATION GROUP INSURANCE AND FLEXIBLE BENEFITS PROGRAM,<br><br>Defendants. | Case No. 2:20-cv-00496-KM-ESK |

## AMENDED COMPLAINT

By way of this Complaint, and to the best of its knowledge, information, and belief, formed upon a reasonable inquiry under the circumstances, Plaintiff Prestige Institute for Plastic Surgery, P.C. ("Prestige") and Keith M. Blechman, M.D., P.C. ("Blechman") (collectively, "Plaintiffs"), on behalf of Patient HG, brings this action against Keystone Healthplan East ("Keystone"), and Blue Cross of California, d/b/a Anthem Blue Cross ("Anthem") (together, "Defendants").

1. This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning Defendants' under-reimbursement to Plaintiff HG for coverage of post-mastectomy breast reconstruction surgical services mandated by Federal law.

2. Anthem was the insurer of the Plan, Che Services (the "Plan"), under which the Patient, HG, was the Plan participant.

1

3. Under the Blue Cross Blue Shield Blue Card Program, which applied in this case, and in which Keystone and Anthem participate, Anthem was the Home Plan, and Keystone was the Host Plan.

4. Anthem applied its own payment methodology, denied Plaintiffs' appeals of the significant under-reimbursement of claims in this case, and imposed out-of-network patient responsibility liability on Patient HG.

5. Patient HG was initially diagnosed with breast cancer. She underwent a bilateral mastectomy. On May 30, 2018, Joseph F. Tamburrino, M.D. and Blechman as co-surgeons performed bilateral breast reconstruction surgery. On November 19, 2018, Dr. Tamburrino performed additional breast reconstruction surgery.

6. Tamburrino and Blechman do not participate in Keystone's network of contracted health care providers.

7. After each of these breast reconstruction surgeries, Plaintiffs submitted invoices in the form of CMS-1500 forms as required to Keystone for a total amount of $417,125.13. In violation of Federal law, Defendants reimbursed Plaintiff only $17,748.24, leaving an unreimbursed amount of $399,376.89, or 96% of the total amount as the Patient's liability.

## JURISDICTION

8. The Court has subject matter jurisdiction over Plaintiff's ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction).

9. The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendants systematically and continuously conduct business in the State of New Jersey, and otherwise have minimum contacts with the State of New Jersey sufficient to establish personal jurisdiction over them.

10. Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) Keystone has an agent, and transacts business in the District of New Jersey, (b) Anthem has an agent and transacts business in the District of New Jersey; and (c) one Plaintiff has an office and both Plaintiffs practice medicine in the District of New Jersey.

11. Venue is also appropriate under 29 U.S.C. § 1132(e)(2), which requires that an ERISA plan participant (and consequently her assignee) has the right to bring suit where she resides or alleges that the violation of ERISA occurred.

## PARTIES

12. Plaintiff Prestige Institute for Plastic Surgery, P.C., is a physician practice group led by Joseph F. Tamburrino, M.D. Dr. Tamburrino is double-Board-certified in plastic surgery by the American Board of Plastic Surgery and the American Board of Surgery. He received his medical degree from Thomas Jefferson Medical College and completed his residency training in general surgery at Temple University Hospital. He completed his plastic surgery residency at the Cleveland Clinic. He received fellowship training in Reconstructive Microsurgery at UCLA. Plaintiff's office is located in Cherry Hill, New Jersey.

13. Plaintiff Keith M. Blechman, M.D. is a plastic and reconstructive surgeon who office is located on Park Avenue in New York City. He received his medical degree from New York University School of Medicine and New York University's Institute for Reconstructive Plastic Surgery where he studied stem cell biology application in wound healing and tissue regeneration. He completed a reconstructive microsurgery fellowship at M.D. Anderson Cancer Center.

14. Defendant Keystone Health Plan East is a Health Maintenance Organization ("HMO") owned by Independence Blue Cross ("IBC"). It is located in Philadelphia, Pennsylvania.

15. Defendant Anthem is a health care insurance company with offices located in Los Angeles, California. It is the parent company of Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California. Anthem It is the insurer for the Plan.

## FACTUAL ALLEGATIONS

### A. The Blue Card Program

16. The Blue Card Program, in which each Blue Cross Blue Shield ("BCBS") licensee must participate, including Keystone and Anthem, was the direct result of the practice of all the BCBS licensees, under the direction of the Blue Cross Blue Shield Association ("BCBSA"), to engage in exclusive geographical market allocation.

17. Under this practice, each BCBS licensee was allocated an exclusive geographic market to market health insurance. This practice continues today.

18. Keystone's allocated exclusive market is the county of Philadelphia and certain contiguous counties. Accordingly, it cannot offer health insurance in California, which is allocated to Anthem.

19. Anthem's allocated exclusive market is the State of California. It cannot offer health insurance in any adjacent state. It cannot offer health insurance in Philadelphia or anywhere in Pennsylvania.

20. These restrictions insulate Keystone and Anthem against competition from each other in their respective exclusive geographic market areas.

21. As part of their mandatory agreement to participate in the Blue Card Program, Keystone and Anthem commit that other than in contiguous areas (counties adjacent to their allocated geographical market areas), they will not contract, solicit or negotiate with providers outside of their allocated geographical market areas.

22. To make this mandatory agreement work, the BCBSA created Home and Host Plans.

23. The Blue Cross Blue Shield insurer in the exclusive geographical area through which the member is enrolled is the Home Plan. In this case, it is Anthem. The Blue Cross Blue Shield insurer located in the exclusive geographical area where the service is provided is referred to as the Host Plan. In this case, it is Keystone.

24. When a provider network is involved, Anthem would rely on Keystone's network under the Blue Card Program, since Keystone is the Host Plan where the provider's services are provided. Anthem would still look to Keystone to determine whether Tamburrino and Blechman were in Keystone's network. In this case, Tamburrino and Blechman were out-of-network with Keystone. As noted above, Anthem was prohibited from contracting with Tamburrino and Blechman directly and must rely upon the adequacy of Keystone's network.

25. Under the Blue Card Program, Prestige and Blechman were required to and did bill Keystone, not Anthem, since the surgical services were rendered in Pennsylvania. Under the Blue Card program, and in this case, Keystone was the agent of Anthem.

### B. The May 30, 2018 Breast Reconstruction

26. One in eight women in the United States have or will develop breast cancer. Their individual choices on how to treat their breast cancer – by a lumpectomy, mastectomy, chemotherapy, radiation, and subsequent breast reconstruction – go well beyond treating and removing the cancerous cells in their bodies because these choices must be based on their individual identities. Breast reconstruction is a choice, and once made, under federal law it must be fully covered.

27. Breast reconstruction is a federal mandate under the Women's Health and Cancer Rights Act ("WHCRA"), enacted in 1998, which requires that group health plans cover breast reconstruction procedures after a mastectomy. This law, codified at 29 U.S.C. § 1185b, states:

> (a) In general. A group health plan . . . shall provide, in case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for –
>
>> (1) all stages of reconstruction of the breast on which mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage . . .
>
> (d) Rule of construction. Nothing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section.

28. Under 29 U.S.C. § 1185b(c), a "group health plan, and a health insurance issuer offering group insurance coverage in connection with a group health plan, may not (2) penalize or otherwise *reduce or limit the reimbursement* of an attending provider . . ." (emphasis added). Under 29 U.S.C. § 1185b(d), a group health plan or insurer may negotiate with a provider. Therefore, under the WHCRA and the terms of the Plan the Defendants should have, but failed to, negotiate with Plaintiff to eliminate the balance bill and all other out-of-network patient liability amounts.

29. The WHCRA was enacted in October 21, 1998, not only because of horror stories of "drive-through mastectomies" in which women were forced into four-hour out-patient mastectomy surgeries by their insurance companies to save money, but because of denials of coverage for breast reconstruction on the basis that such reconstruction was cosmetic. As Senator Snowe stated in committee:

6

> We have also found that breast reconstructive surgery is considered cosmetic surgery. Well, it is not. Forty-three percent of women who want to undergo breast reconstructive surgery cannot because it is deemed cosmetic. And that is wrong. Breast reconstructive surgery is designed to restore a woman's wholeness.

144 Cong. Rec. § 4644 at *4648 (May 12, 1998).

30. Accordingly, breast reconstruction was a covered service under Patient HG's Plan.

31. Because a woman must and does have a choice about her body, this includes the choice of what specialist she can trust for her breast reconstruction procedures. Breast reconstruction is a complex surgery with many options. The Deep Inferior Epigastric Perforator Flap ("DIEP") procedure provides the best psychological outcome and long-term prospects. The DIEP procedure is a cutting-edge micro-surgical breast reconstruction procedure that utilizes a flap of complete tissue, blood vessels, skin and fat from a woman's lower abdomen as donor tissue to create breast flaps. The flap is then transplanted to the chest where the vessels are connected to the chest vessels. The flap is then shaped into a new breast and the abdomen is surgically closed. Unlike a TRAM flap, a different and older breast reconstruction procedure, the DIEP procedure preserves the abdominal muscles and allows for the preservation of abdominal strength and integrity. However, the procedure requires two co-surgeons specializing in microsurgery working together in a surgery that lasts for 8-12 hours. There are few surgeons with the proper specialized training to perform this complex procedure. The surgery is performed by plastic surgeons who are board-certified and who have completed a post-residency fellowship in plastic surgery, and micro-surgical reconstructive surgery.

32. On May 30, 2018, Patient HG underwent bilateral breast reconstruction at Doylestown Hospital immediately subsequent to a bilateral mastectomy. Tamburrino, who was co-surgeon, also performed an internal mammary lymph node biopsy. He received prior authorization from Anthem for this medically necessary procedure.

7

33. After performing this breast reconstruction surgery, Prestige submitted an invoice on a CMS-1500 form to Keystone, as required, for $162,344.61. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $2,131.00 |
| S2068-62-LT | $50,000.00 | $1,065.50 |
| 15734-RT | $21,517.08 | $845.55 |
| 15734-LT | $21,517.08 | $313.43 |
| 38530-LT | $7,903.09 | $221.47 |
| 35761-RT | $5,698.68 | $221.47 |
| 35761-LT | $5,698.68 | $221.47 |
| **Total** | **$162,334.61** | **$5,643.97** |

S2068 is a HCPCS Level II Code for a DIEP procedure. CPT code 15734 is a flap procedure. It is separately compensable. CPT code 38530 is Excision Procedures on the Lymph Nodes. CPT code 35761 is artery and vein repair. Modifier -62 means co-surgeon.

34. The entire amount that Anthem paid was applied to the amount of Patient HG's patient liability. Accordingly, Patient HG was responsible for the full amount of the $162,334.61 billed charge.

35. Anthem reimbursed Prestige incorrectly. It did not cover the breast reconstruction procedures under the WHCRA, and reimbursement should not have been reduced.

36. In addition, Anthem did not follow its own rules. It reduced reimbursement based on its co-surgeon policy although its policy states: "It is not considered co-surgery when two surgeons are performing separate procedures on different anatomical sites during the same

operative session. Each surgeon is considered the primary surgeon for that specific procedure and will be reimbursed up to 100% of the maximum allowance."

37. Dr. Tamburrino was co-surgeon with Dr. Blechman. They operated on different anatomical sites simultaneously. Therefore, Dr. Tamburrino must be reimbursed at 100%, not at the lower co-surgeon rate.

38. Anthem also applied the multiple surgery rule for each separately compensable surgical procedure for the left and right breasts. The multiple surgical rule is appropriate in those limited occasions when multiple procedures are separately compensable, performed by the same provider, but are secondary to the primary procedure. In this case, bilateral procedures are not connected by definition and must be reimbursed as separate and independent surgical procedures.

39. Prestige filed a first-level appeal concerning the amount of Defendants' reimbursement of Prestige's bill on December 18, 2018.

40. Anthem denied this appeal in a letter dated January 15, 2019. It stated that the "maximum allowable amount" was determined by the local plan and was applied to the member's deductible.

41. The Combined Evidence of Coverage and Disclosure Form for the Plan ("EOC") specified how Prestige's breast reconstruction procedure must be reimbursed. Under the WHCRA, which is incorporated in every EOC, reimbursement cannot be reduced by applying out-of-network rates. The procedure must be covered and the amounts cannot be reduced. EOC, at 166.

42. The Plan EOC's normal out-of-network rates were based on its definition of the "maximum allowed amount." This was based on covered services rendered outside of Anthem's service area by non-participating providers. Under the terms of the Plan, this amount is based on the local (meaning Host) plan non-participating provider fee schedule (which is not otherwise described) or the pricing arrangements according to federal or state law. "In certain situations, the

maximum allowed amount for out of area claims may be based on billed charges, the pricing we would use if the healthcare services had been obtained within the Anthem Blue Cross service area, or a special negotiated price."

43. According to the January 15, 2019 appeal denial letter, however, Defendants failed to base Prestige's reimbursement on the WHCRA. They also failed to describe or explain the non-participating provider fee schedule. Since the terms of the WHCRA are incorporated into the EOC and this ERISA plan requires that all adverse benefit determinations are accompanied by detailed explanations of the methodology and protocol involved in making the determination, Defendants violated ERISA.

44. The Plan specified no required no required levels of appeal. Consequently, Prestige exhausted the Patient's administrative remedies.

45. Nonetheless, On March 18, 2019, Plaintiff filed another appeal concerning the amount of Defendant's reimbursement of Prestige's bill.

46. Anthem denied this appeal on May 15, 2019. It reiterated that it had paid the maximum allowable amount as the provider was out-of-network and no additional benefits were due.

47. After performing the May 30, 2018 breast reconstruction surgery as co-surgeon with Tamburrino, Blechman submitted an invoice on a CMS-1500 form to Keystone, as required, for $174,200.00. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $0.00 |
| S2068-62-LT | $50,000.00 | $3,039.25 |
| 15734-RT | $30,000.00 | $0.00 |
| 15734-LT | $30,000.00 | $0.00 |

| | | |
|---|---|---|
| 38530-LT | $3,000.00 | $58.03 |
| 35761-RT | $5,600.00 | $0.00 |
| 35761-LT | $5,600.00 | $122.91 |
| **Total** | **$174,200.00** | **$3,220.19** |

48. The EOB stated: "This is the amount that exceeds the maximum allowed amount." Defendants did not explain or describe the definition of "maximum allowed amount," in violation of ERISA

49. Blechman filed a first-level appeal concerning the amount of Defendants' reimbursement of his bill on April 18, 2019. It paid an additional amount of $3,220.10 but otherwise upheld its processing of the bill.

50. This decision highlights the arbitrary and capricious nature of Defendants' determinations, since Prestige and Blechman billed for the same CPT codes and performed the same surgical procedures as co-surgeons. Yet, they were paid different amounts, and Blechman received an additional payment.

51. Because the Plan had no required levels of appeal, Bechman exhausted the Patient's administrative remedies.

### C. November 19, 2018 Breast Reconstruction

52. On November 19, 2018, Dr. Tamburrino performed additional breast reconstruction procedures on Patient HG as part of a continuation of care: fat grafting to shape the breasts, bilateral nipple-areolar reconstruction, and surgical repair of the abdominal donor site.

53. Prestige submitted an invoice on a CMS-1500 form, as required, for $80,590.51. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
|---|---|---|
| 14301 | $15,431.91 | $979.28 |

| | | |
|---|---|---|
| 19350-LT | $11,834.81 | $747.33 |
| 19350-RT | $11,834.81 | $747.33 |
| 19380-LT | $11,089.91 | $859.44 |
| 19380-RT | $11,089.91 | $859.44 |
| 15770-LT | $9,654.58 | $735.58 |
| 15770-RT | $9,654.58 | $735.58 |
| **Total** | **$80,590.51** | **$5,663.98** |

CPT code 14301 is Adjacent Tissue Transfer or Rearrangement Procedures on the Integumentary (Skin) System. CPT code 19350 is breast reconstruction. CPT code 19380 is revising an already reconstructed breast. CPT code 15770 is Flaps and Grafts Procedures.

54. The entire amount that Anthem paid was applied to the amount of Patient HG's patient liability. Accordingly, Patient HG was responsible for the full amount of the $80,590.51 billed charge.

55. Anthem reimbursed Tamburrino incorrectly. It applied out-of-network rules when under the WHCRA reimbursement should not have been reduced.

56. However, Anthem did not reduce reimbursement for the bilateral procedures based on multiple procedure or other rules. It thereby conceded that it should not have reduced reimbursement for the bilateral procedures performed during the May 30, 2018 surgery.

57. Prestige filed a first-level appeal concerning his under-reimbursement on May 23, 2019. It sent a second-level appeal on October 23, 2019. The appeals were denied on the basis that no authorization form was included. The basis for the denials was erroneous on its face because the appeal letters did include Assignment of Benefits and Designated Authorized Representative forms, which apply to authorize a provider to represent a plan member pursuant to ERISA. Defendants ignored these forms. Prestige exhausted its administrative remedies.

58. Patient HG assigned her payments to Tamburrino. The Assignment stated, in pertinent part:

> I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any payments) under my health insurance policy or benefit plan to Dr. Joseph Tamburrino . . . with respect to . . . bring any appeal, lawsuit, or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination of benefits under any insurance policy or benefit plan.

59. Patient HG assigned her payments to Blechman. The Assignment stated, in pertinent part:

> I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any payments) under my health insurance policy or benefit plan to Keith M. Blechman [and] Dr. Keith M. Blechman, M.D., P.C. . . . with respect to . . . bring any appeal, lawsuit, or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination of benefits under any insurance policy or benefit plan.

60. Plaintiffs received Designation of Authorized Representative from Patient HG. They stated, in relevant part:

> I hereby appoint as a Designated Authorized Representative each of my Providers and . . . lawyers (including the Law Offices of Cohen and Howard) . . . [including the] right of my Authorized Representative to pursue . . . litigation or otherwise under any Federal or State law with respect to payment for services provided by a Provider to me, including penalties, interest, and attorney fees.

61. ERISA allows an Authorized Representative to bring litigation on behalf of a Plan Participant or Beneficiary of an ERISA Plan.

62. The Plan does not contain an anti-assignment provision under the circumstances pertaining to the services in this case.

63. The assignment language in the Plan states as follows:

> Any assignment of benefits, even if assignment includes the providers [sic] right to receive payment, is generally void. *However, there are certain situations in which an assignment of benefits is permitted.* For example, if you go to a participating provider that is a hospital or facility at which, or as a result of which, you receive

>covered non-emergency services from a non-participating provider . . . an assignment of benefits to such non-participating provider will be permitted.

EOC, at 131 (emphasis added)

64. Doylestown Hospital, where the breast reconstruction surgeries were performed, was, on information and belief, in Keystone's network of hospitals and therefore was a participating hospital. Since the breast reconstruction procedures were covered on a non-emergency basis, under the Plan terms assignment was permitted. In addition, under ERISA appointment of an Authorized Representative is always permitted and cannot be disallowed by a plan or contract.

65. Breast reconstruction was a covered service under Patient HG's Plan because it was mandated under the WHCRA.

66. Notwithstanding this federal mandate, upon information and belief Keystone did not have any in-network providers with admitting privileges at Doylestown Hospital who were qualified to perform the highly specialized microsurgical DIEP breast reconstruction surgery that was performed on Patient HG working as a team with the in-network breast surgeon who performed the mastectomy.

67. Defendants' decision to assess the patient $399,376.89 in out-of-pocket costs for breast reconstruction surgeries that must be covered was not a coverage decision. It was, instead, a decision forcing Patient HG to self-insure her own breast reconstruction surgery, in violation of the WHCRA.

        **D.**     **Full and Fair Review under ERISA**

68. 29 C.F.R. § 2560.503-1(g) provides as follows:

**Manner and content of notification of benefit determination.**

(1) The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant -

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan -

(A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

69. Defendants did not provide the information required by 29 C.F.R. § 2560.503-1(g), in violation of ERISA and the rules promulgated thereunder. The appeals submitted in this case requested this information. Defendants did not provide full and fair review to Plaintiffs.

70. In its January 15, 2019, appeal denial letter, Anthem simply stated that it had paid the claim based on the "maximum allowable amount." Anthem did not provide the specific reasons for the denial, refer to the specific plan provisions on which the determination was based, or describe the plan's review procedures. It did not explain what the "maximum allowable amount" was or how it determined it in this case as it was required to do under ERISA.

71. The same applied to Anthem's May 15, 2019, appeal denial letter. In that letter, it stated that it had paid the maximum allowable amount as the provider was out of network and no additional benefits were due.

72. The required language also applies to adverse benefit determinations made in EOBs. When Anthem issued EOBs for each of the lowered reimbursements at issue in this case, it simply pointed to "the amount that exceeds the maximum allowed amount." Such language does not meet the detailed explanation standard required by ERISA.

73. Through this failure, Defendants violated ERISA.

74. Under ERISA, upon a failure to follow the procedures set out in the Plan, as here, the claimant is deemed to have exhausted her administrative remedies.

75. Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

> [I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

## COUNT I

### CLAIM AGAINST DEFENDANT KEYSTONE FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

76. Defendant Keystone is obligated to pay benefits to the Plan participant in accordance with the terms of the Plan's EOC, and in accordance with ERISA. This obligation arises under the Blue Card Program, and under ERISA.

77. Defendant Keystone violated its legal obligations under this ERISA-governed Plan when it, together with Anthem and as its agent, under-reimbursed Plaintiffs for breast reconstruction surgeries provided to Patient HG by Plaintiffs, in violation of the terms of the Plan EOC and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B), for failing to provide

the EOC to the Plan participant and Plaintiffs prior to commencement of this action, and for failing to provide for full and fair review.

78. Plaintiffs submitted invoices to Defendant Keystone for $417,125.13.

79. Defendant Keystone together with Defendant Anthem determined that the Allowed Amount was $17,748.24, leaving an under-reimbursed amount of $399,376.89. Defendant thereby reimbursed 4% of the total amount.

80. Plaintiffs were required to bill all amounts directly to Keystone.

81. Defendant Keystone acted as Defendant Anthem's agent under the Blue Card Program.

82. Plaintiffs seek unpaid benefits and statutory interest back to the date Plaintiffs' claims were originally submitted to Defendant Keystone. They also seek attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Keystone.

## **COUNT II**

### **CLAIM AGAINST DEFENDANT ANTHEM FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA**

83. Defendant Anthem is obligated to pay benefits to the Plan participant in accordance with the terms of the Plan's EOC, and in accordance with ERISA. This obligation arises under the Blue Card Program, and under ERISA.

84. Defendant Anthem violated its legal obligations under the Plan when it, together with Keystone, under-reimbursed Plaintiffs for breast reconstruction surgeries provided to Patient HG by Plaintiffs, in violation of the terms of the EOC and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B), for failing to provide the EOC to the Plan participant and Plaintiffs before commencement of this action, and for failing to provide for full and fair review.

85. Defendant Anthem together with Defendant Keystone determined that the Allowed Amount was $17,748.24, leaving an under-reimbursed amount of $399,376.89. Defendant thereby reimbursed 4% of the total amount.

86. Plaintiffs seek unpaid benefits and statutory interest back to the date Plaintiffs' claims were originally submitted to Defendant Keystone. They also seek attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Anthem.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

(a) Ordering Defendants to recalculate and issue unpaid benefits to Plaintiffs;

(b) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees under ERISA, and costs and expenses in amounts to be determined by the Court;

(c) Awarding prejudgment interest; and

(d) Granting such other and further relief as is just and proper.

Dated: February 5, 2020

/s/ Michael F. Fried
AXELROD LLP
354 North Fourth Avenue
Highland Park, NJ 08904
(732) 718-6171
mfried@axelrodllp.com

Robert J. Axelrod
*Pro hac vice admission pending*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
(646) 448-5263
rjaxelrod@axelrodllp.com

        Leslie S. Howard
        COHEN HOWARD LLP
        766 Shrewsbury Avenue, Suite 200
        Tinton Falls, NJ 07724
        (732) 747-5202
        lhoward@cohenhoward.com

        Attorneys for Prestige Institute for Plastic
        Surgery, P.C. and Keith M. Blechman,
        M.D., P.C. on behalf of Patient HG