# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PRESTIGE INSTITUTE FOR PLASTIC SURGERY, P.C.,** and **KEITH M. BLECHMAN, M.D., P.C.,** on behalf of PATIENT HG, <br><br> Plaintiffs, <br><br> v. <br><br> **KEYSTONE HEALTHPLAN EAST, BLUE CROSS OF CALIFORNIA d/b/a ANTHEM BLUE CROSS,** and **SIEMENS CORPORATION GROUP INSURANCE AND FLEXIBLE BENEFITS PROGRAM** <br><br> Defendants. | Civ. No. 20-496 (KM) (ESK) <br><br> **OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Prestige Institute for Plastic Surgery, P.C. ("Prestige")[1] and Keith M. Blechman, M.D., P.C. ("Blechman"), on behalf of their patient HG, bring this action against Keystone Healthplan East ("Keystone"), and Blue Cross of California, d/b/a Anthem Blue Cross ("Anthem") under the Employee Retirement Income Security Act of 1964 ("ERISA") and its governing regulations. (Am. Compl. ¶1) [2]

---

[1] Prestige is a physician practice group led by Joseph F. Tamburrino, M.D. (Am. Compl. ¶12)

[2] Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

   "DE" = Docket entry number in this case.

   "Am. Compl." = Amended Complaint (DE 11)

Plaintiffs' main contention is that Defendants under-reimbursed HG "for coverage of post-mastectomy breast reconstruction surgical services mandated by federal law." (Am. Compl. ¶1) Specifically, Plaintiffs submit that "[b]reast reconstruction is a federal mandate under the Women's Health and Cancer Rights Act ('WHCRA') . . . which requires that group plans cover breast reconstruction procedures after a mastectomy." (Am. Compl. ¶27)

Defendants Keystone and Anthem have filed motions (DE 23, DE 24) to dismiss the Amended Complaint for failure to establish standing and failure to state a claim under ERISA. For the reasons explained herein, although I find that Plaintiffs have established standing, I will grant Defendants' Rule 12(b)(6) motions to dismiss the Amended Complaint for failure to state a claim.

## I.   Summary

### a.  Factual Background

The Amended Complaint alleges that Anthem was the insurer of Che Services ("the Plan"), under which HG was a participant. (Am. Compl. ¶2) Both Anthem and Keystone participate in the Blue Cross Blue Shield Card Program ("Blue Card Program"). (Am. Compl. ¶3)

Under that program, each Blue Cross Blue Shield ("BCBS") licensee is "allocated an exclusive geographic market." (Am. Compl. ¶17) Keystone's exclusive market is Philadelphia and Anthem's exclusive market is California. (Am. Compl. ¶¶18-19) As a result of that structure, Keystone cannot offer health insurance in California, and Anthem cannot offer health insurance in Philadelphia (or anywhere in Pennsylvania). (Am. Compl. ¶¶18-19)

Through their mandatory agreement to participate in the Blue Card Program, Keystone and Anthem "will not contract, solicit or negotiate with providers outside of their allocated geographical market areas." (Am. Compl. ¶21) The BCBS insurer in the exclusive geographical region in which a member is enrolled is called the Home Plan; in this case, the patient's Home Plan is Anthem. (Am. Compl. ¶23) Where a member obtains medical services outside the Home Plan region, the BCBS insurer for the region where services are

2

provided is called the Host Plan; in this case, the Host Plan is Keystone. (Am. Compl. ¶23)

HG was diagnosed with breast cancer and underwent a bilateral mastectomy. (Am. Comp. ¶5) On May 30, 2018, co-surgeons Joseph F. Tamburrino, M.D. and Blechman performed bilateral breast reconstruction surgery ("the May 30 Surgery") in Doylestown Hospital in Pennsylvania.[3] (Am. Compl. ¶¶5, 25, 32) Specifically, Dr. Blechman and Dr. Tamburrino performed the Deep Inferior Epigastric Perforator Flap ("DIEP") procedure, which they allege "provides the best psychological outcome and long-term prospects." (Am. Compl. ¶31) "[T]he procedure requires two co-surgeons specialized in microsurgery working together." (Am. Compl. ¶31)

HG enrolled in in California; the surgery was performed in Pennsylvania. Because the surgery occurred outside the area of HG's enrollment, Anthem "would look to Keystone," the insurer of the area where the surgery took place, "to determine whether Tamburrino and Blechman were in Keystone's network." (Am Compl. ¶24) They were not; "Tamburrino and Blechman were out-of-network with Keystone." (Am. Compl. ¶24) Under the Blue Card Program, "Anthem was prohibited from contracting with Tamburrino and Blechman directly and must rely upon the adequacy of Keystone's network." (Am. Compl. ¶24) Plaintiffs allege that, under the Blue Card Program, they "were required to and did bill Keystone, not Anthem, since the surgical services were rendered in Pennsylvania." (Am. Compl. ¶25) As a result of that program, "Keystone was the agent of Anthem." (Am. Compl. ¶25)

After the May 30 Surgery, Prestige submitted an invoice to Keystone for $162, 344.61. (Am. Compl. ¶33)

The CPT codes, the amount billed, and the amount paid for the services were as follows:

---

[3] Tamburrino also performed an internal mammary lymph node biopsy for which he received prior authorization from Anthem. (Am. Compl. ¶32

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $2,131.00 |
| S2068-62-LT | $50,000.00 | $1,065.50 |
| 15734-RT | $21,517.08 | $845.55 |
| 15734-LT | $21,517.08 | $313.43 |
| 38530-LT | $7,903.09 | $221.47 |
| 35761-RT | $5,698.68 | $221.47 |
| 35761-LT | $5,698.68 | $221.47 |
| **Total** | **$162,334.61** | **$5,643.97** |

(Am. Compl. ¶33) The cited CPT codes signify the following: S2068 is the code for the DIEP procedure, 15734 for the flap procedure, 38530 for the excision procedures on the lymph nodes, and 35761 for artery and vein repair. (Am. Compl. ¶33) The modifier "-62" indicates a co-surgeon. (Am. Compl. ¶33)

Plaintiffs allege that "[t]he entire amount that Anthem paid was applied to the amount of Patient HG's liability." (Am. Compl. ¶34) Thus, HG became "responsible for the full amount of the $162,334.61 billed charge." (Am. Compl. ¶34) Plaintiffs submit that Anthem reimbursed Prestige incorrectly and did not cover the breast reconstruction procedures as it was required to do under federal law. (Am. Compl. 34)

On December 18, 2018, Prestige filed a first-level appeal of the amount reimbursed, which Anthem denied on January 15, 2019. (Am. Compl. ¶¶ 39-40) Anthem "stated that the 'maximum allowable amount' was determined by the local plan and was applied to the member's deductible." (Am. Compl. ¶40) On March 18, 2019, Prestige filed another appeal, which was denied on May 15, 2019 for the same reasons explained in the January 15, 2019 denial letter. (Am. Compl. ¶¶45-46)

Also for the May 30 Surgery, Blechman submitted an invoice, separate from Prestige's invoice, to Keystone for $174, 200.00 (Am. Compl. ¶47) The breakdown is as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $0.00 |

4

| | | |
|---|---|---|
| S2068-62-LT | $50,000.00 | $3,039.25 |
| 15734-RT | $30,000.00 | $0.00 |
| 15734-LT | $30,000.00 | $0.00 |
| 38530-LT | $3,000.00 | $58.03 |
| 35761-RT | $5,600.00 | $0.00 |
| 35761-LT | $5,600.00 | $122.91 |
| **Total** | **$174,200.00** | **$3,220.19** |

(Am. Compl. ¶47)

The Explanation of Benefits ("EOB") stated: "This is the amount that exceeds the maximum allowed amount." (Am. Compl. ¶48) Blechman filed a first-level appeal on April 18, 2019. (Am, Compl. ¶49) Anthem then "paid an additional amount of $3,220.10 but otherwise upheld its processing of the bill." (Am. Compl. ¶49)

Because only one level of appeal was required for each invoice, Plaintiffs submit they have exhausted their administrative remedies. (Am. Compl. ¶¶44,51)

On November 19, 2018, Tamburrino performed an additional breast reconstruction surgery ("November 19 Surgery") on HG "as part of a continuation of care." (Am. Compl. ¶52) Prestige then submitted an invoice for $80,590.51. (Am Compl. ¶53) The breakdown of payment is as follows:

| CPT | Billed Amount | Paid Amount |
|---|---|---|
| 14301 | $15,431.91 | $979.28 |
| 19350-LT | $11,834.81 | $747.33 |
| 19350-RT | $11,834.81 | $747.33 |
| 19380-LT | $11,089.91 | $859.44 |
| 19380-RT | $11,089.91 | $859.44 |
| 15770-LT | $9,654.58 | $735.58 |
| 15770-RT | $9,654.58 | $735.58 |

(Am. Compl. ¶53) CPT code 14301 is Adjacent Tissue Transfer, 19350 is breast reconstruction, 19380 is revising an already reconstructed breast, and 15770 is Flaps and Grafts Procedures. (Am. Compl. ¶53)

5

Plaintiffs allege that "[t]he entire amount that Anthem paid was applied to the amount of Patient HG's patient liability." Consequently, "HG was responsible for the full amount of the $80,590.51 billed charge." (Am. Compl. ¶54) Plaintiffs submit that Anthem reimbursed Tamburrino incorrectly by improperly reducing reimbursement. (Am. Compl. ¶55)

Prestige filed a first-level appeal on May 23, 2019, and a second-level appeal on October 23, 2019, both of which "were denied on the basis that no authorization form was included." (Am. Compl. ¶57) Prestige submits that the basis for denial was erroneous and that it has exhausted its administrative remedies. (Am. Compl. ¶57)

HG assigned her rights to payment to both Tamburrino and Blechman in two separate assignment agreements. (Am. Compl. ¶¶58-59) Plaintiffs allege that "[t]he Plan does not contain an anti-assignment provision under the circumstances pertaining to the services in this case." (Am. Compl. ¶62) The Plan does, however, contain anti-assignment language:

> Any assignment of benefits, even if assignment includes the providers [sic] right to receive payment, is generally void. *However, there are certain situations in which an assignment of benefits is permitted.* For example, if you go to a participating provider that is a hospital or facility at which, or as a result of which, you receive covered non-emergency services from a non-participating provider . . . an assignment of benefits to such non-participating provider will be permitted.

(Am. Compl. ¶63 (alterations and emphasis in complaint))

Plaintiffs also received a Designation of Authorized Representative from HG. (Am. Compl. ¶60)

Plaintiffs allege on information and belief that Doylestown Hospital, where the services were rendered, was in Keystone's network of hospitals. (Am. Compl. ¶64) Also on information and belief, Plaintiffs allege that "Keystone did not have any in-network providers with admitting privileges at Doylestown Hospital who were qualified to perform the highly specialized microsurgical DIEP breast reconstruction surgery that was performed on Patient HG working

6

as a team with the in-network breast surgeon who performed the mastectomy."
(Am. Compl. ¶66)

### b. Procedural History

Plaintiffs filed the initial Complaint on January 15, 2020 (DE) and the
Amended Complaint on February 5, 2020 (DE 11).[4]

In Count I of the Amended Complaint, Plaintiffs allege that Keystone
violated its legal obligation under the Plan when Keystone, together with
Anthem and as Anthem's agent, under-reimbursed Plaintiffs for breast
reconstruction surgeries, failed to provide the Combined Evidence of Coverage
and Disclosure Form for the Plan ("EOC") to HS and plaintiffs prior to
commencement of this action, and failed to provide for full and fair review of
the benefit determinations. (Am. Compl. ¶¶76-77)

In Count II, Plaintiffs allege a substantially similar claim against Anthem,
*i.e.,* that it violated its legal obligations under the Plan when Anthem, together
with Keystone, under-reimbursed Plaintiffs for breast reconstruction surgeries,
failed to provide the EOC to HG and plaintiffs before commencement of the
action, and failed to provide for full and fair review of the benefit
determinations. (Am. Compl. ¶¶83-84)

Defendants Keystone and Anthem separately filed motions to dismiss
(DE 23, DE 24), which are now before the Court.

### II. Discussion

### a. Standing under ERISA

Plaintiffs assert four bases for their standing to bring this action: (1) HG's
Assignment of benefits to Plaintiffs, (2) HG's grant of power of attorney to
Plaintiffs, (3) HG's Designation of Authorized Representative, and (4) Plaintiffs'

---

[4] In the initial Complaint, Plaintiffs asserted claims against Keystone, Anthem, and Siemens Corporation Group Insurance and Flexible Benefits Program ("Siemens"). (DE 1 at 1) Plaintiffs did not assert a claim against Siemens in the Amended Complaint and, on February 5, 2020, filed a Notice of Voluntary Dismissal (DE 12), without prejudice, against Siemens. The Court so-ordered that dismissal on February 6, 2020. (DE 13)

purported status as HG's beneficiaries. (DE 28 at 14-12) I focus here on the first theory, based on the executed assignments of benefits.

ERISA provides employees covered by health insurance plans "with the right to sue to 'recover benefits due . . . under the terms of [the] plan.'" *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 449 (3d Cir. 2018) (quoting 29 U.S.C. § 1132(a)(1)(B)). The right to sue "is limited to the 'participant' or 'beneficiary' under the plan." *Id.* A healthcare provider does not fall into either category. *Id.*; *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004). However, in *North Jersey Brain & Spine Center v. Aetna, Inc.*, the United States Court of Appeals for the Third Circuit recognized that a valid assignment of benefits by a plan participant or a beneficiary transfers to such provider the insured's right to payment and the insured's right to sue for that payment. 801 F.3d 396 (3d Cir. 2015); *Am. Orthopedic*, 880 F.3d at 450. In other words, a valid assignment may confer upon the provider the insured's standing under ERISA.

In the meantime, however, insurers had responded by inserting anti-assignment provisions into their plans. In *American Orthopedic*, the Third Circuit held that "anti-assignment clauses in ERISA-governed health insurance plans as a general matter are enforceable." 880 F.3d at 453. Therefore, provider standing can be blocked through a valid anti-assignment provision. *See id.*

Here, Plaintiffs acknowledge that the Plan contains an anti-assignment provision, but allege that the anti-assignment provision does not apply "under the circumstances pertaining to the services in this case." (Am. Compl. ¶ 62) Quoting the anti-assignment provision, Plaintiffs assert that this is one of the "certain situations in which an assignment of benefits is permitted." (Id. ¶ 63)

The anti-assignment clause provides as follows:

> Any assignment of benefits, even if assignment includes the providers right to receive payment, is generally void. However, there are certain situations in which an assignment of benefits is permitted. For example, if you go to a *participating provider* that is a *hospital* or facility at which, or as a result of which, you receive covered

8

> non-*emergency services* from a *non-participating provider* such as a radiologist, anesthesiologist, or pathologist, an assignment of benefits for such *non-participating provider* will be permitted.[5]

(DE 24-5 at 140 (emphasis in original))

The exception in the provision, then, states that an assignment of benefits for a non-participating provider will be permitted if you (the insured)

(1) "go to a participating provider that is a hospital" and

(2) "receive covered non-emergency services from a non-participating provider such as a radiologist, anesthesiologist, or pathologist"

Citing this provision, Plaintiffs submit that an assignment of benefits is permitted by the Plan here because

(1) HG did allegedly "go to a participating provider that is a hospital" (Doylestown Hospital), where HG

(2) "receive[d] covered non-emergency services from a non-participating provider" (the surgeons, Drs. Tamburrino and Blechman).

Anthem urges that the exception must be limited by its rationale. This exception, says Anthem, assumes that the primary provider of care (here, the surgeon) is in-network, and is aimed only at *ancillary* or *incidental* out-of-network providers. The exception, says Anthem, "was created to protect patients from surprise bills for services performed by member(s) of the in-network providers' team (*e.g.*, the radiologist, anesthesiologist, or pathologist, etc.) who happened to be out of network." (DE 31 at 5)[6] It "was not created to

---

[5] Although Plaintiffs refer to the Plan in their Amended Complaint, they did not attach a copy. Defendant Anthem submitted the Plan with their Motion to Dismiss (DE 24-5). In deciding a motion under Rule 12(b)(6), courts may consider "document[s] integral to or explicitly relied upon in the complaint*," In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016)

[6] An analysis of "surprise billing" is beyond the scope of this opinion. Classically, a patient being operated on by a participating surgeon might later receive a bill for services rendered by non-participating professionals while the patient was

9

enable out-of-network providers to reap additional benefits by taking advantage of a third-party's (*i.e.*, the in-network hospitals') contractual arrangement." (DE 31 at 5-6)

Anthem plausibly observes that "Plaintiffs were not unselected members of the 'surgical team' – they *were* the surgical team." (DE 31 at 6) And Anthem's argument, stated as a rationale for the exception, makes some sense. Indeed, that may even be what was *meant,* but it is not what the exception *says.* The facts of this case read directly onto the wording of the exception to the anti-assignment provision.

Anthem criticizes these out-of-network surgeons for taking advantage of a "third party's" in-network status. That criticism is not tethered to the Plan's wording. The very example given in the exception is that of an out-of-network physician who renders services at an in-network hospital. (DE 24-5 at 140 ("For example, if you go to a *participating provider* that is a *hospital ….*")).

Anthem argues further that these two non-participating providers, as surgeons, do not stand in the shoes of a "radiologist, anesthesiologist, or pathologist," the examples cited in the exception to the anti-assignment provision. These specialists, however, are presented as examples ("non-participating providers, such as . . ."); the examples are neither stated nor implied to be exclusive. The specialists in the examples, like the surgeons here, would be out-of-network physicians who treated the patient at the participating-provider hospital. If this were a statute, the principle of *ejusdem generis* would not tend to exclude surgeons from the list.

"A contract is ambiguous 'where the contract is susceptible of more than one meaning,' or 'if it is subject to reasonable alternative interpretations.'" *United States v. Pantelidis*, 335 F.3d 226, 235 (3d Cir. 2003) (first quoting

---

under anesthesia. Whether or not literally unconscious, a patient may not be in a position to choose all the members of the team of providers and ascertain that all are participants in the patient's insurance plan. For example, a surgical patient's x-rays might be referred to a specialist to be interpreted, without the patient's having exercised any choice in the matter.

*Sumitomo Mach. Corp. of Am. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996), then quoting *Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991)). The wording of this anti-assignment provision is not ambiguous. The only "ambiguity" is one that Anthem is attempting to insert. In upholding anti-assignment provisions under ERISA-governed plans, the Third Circuit explained that it "perceive[d] no reason to stray from the 'black-letter law that the terms of an unambiguous private contract must be enforced.'" *Am. Orthopedic*, 890 F.3d at 453 (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009). Insurers have benefited from that principle in the past, but the principle works both ways; it also requires literal enforcement of an exception contained within an anti-assignment provision.

It is Plaintiffs' burden to allege and establish standing. *See FOCUS v. Allegheny Cty. Court of Common Pleas*, 75 F.3d 834, 388 (3d Cir. 1996) (citing *Lujan v. Dfs. Of Wildlife*, 504 U.S. 555, 561 (1992)). I hold that Plaintiffs have done so *via* an assignment from their patient, HG, which falls within the literal wording of the exception contained in the anti-assignment provision.[7]

### b. Motion to Dismiss Plaintiffs' ERISA Claim

Plaintiffs have therefore surmounted the threshold barrier of standing, entitling them to consideration of the merits of their claims. I therefore turn to the defendants' Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim.

### 1. Standard

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

---

[7]     I therefore do not address the other three proffered grounds for standing: 2) HG's grant of power of attorney to Plaintiffs, (3) HG's Designation of Authorized Representative, and (4) Plaintiffs' purported status as HG's beneficiaries.

not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

### 2. ERISA Claim

Plaintiffs have failed to plead a plausible ERISA claim for additional reimbursement under the Plan.

"ERISA's framework ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." *In re Unisys Corp. Retiree Medical Benefit ERISA Litigation*, 58 F.3d 896, 902 (3d Cir. 1995); *Univ. Spine Ctr.*, 2020 WL 814181, at *5; *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 11-2775, 2012

WL 762498, at *13 (D.N.J. Mar. 6, 2012). Therefore, "[t]he District of New Jersey has dismissed ERISA claims where plaintiffs failed to cite to specific plan provisions: 'It is the Plaintiff's burden of proof to have the plan documents and cite to specific plan provisions when filing a civil complaint to obtain ERISA benefits.'" *Univ. Spine Ctr. v. Anthem Blue Cross of California*, No. 19-12639, 2020 WL 814181, at *5 (D.N.J. Feb. 18, 2020) (quoting *Ruiz v. Campbell Soup* Co., No. 12-6131, 2013 WL 1737242 at *3 (D.N.J. Apr. 22, 2013)).

To recover under ERISA section 502(a)(1)(B), a plaintiff "must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006); 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought—(1) by a participant or beneficiary—... (B) to recover benefits due to him under the terms of his plan." (emphasis added)); *see also Manning v. Sanofi-Aventis*, U.S. Inc., No. 11-1134, 2012 WL 3542284 at *3 (M.D. Pa. Aug. 14, 2012) ("To state a claim under § 502(a)(1)(B), plaintiff must allege that she was eligible for benefits under the Plan, that defendant wrongfully denied her benefits and that in doing so, defendant violated § 502(a)(1)(B).").

The Amended Complaint fails to satisfy that standard. The plain language of ERISA section 502(a)(1)(B) requires a plaintiff to demonstrate his or her entitlement to "benefits due to him under the terms of his plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Here, the complaint lacks the allegations necessary to set forth a plausible ERISA claim. Plaintiffs state in conclusory terms that they have been under-reimbursed. (Am. Compl. ¶¶77, 84) But under-reimbursement, for ERISA purposes, does not mean merely that the physician received less than the amount billed; rather, the plaintiff physician must identify an entitlement, based on the Plan, to receive more: "[W]hile the complaint identifies a disparity between the amount claimed by Plaintiffs and the amount of Anthem's reimbursement, that disparity alone does not properly support a claim for relief. Plaintiffs do not point to any specific plan provision

that entitles them to the greater amount." *See Univ. Spine Ctr.*, 2020 WL 814181, at *5. It follows, then, that an allegation that "Defendants violated the terms of the Plan in reimbursing Plaintiffs" (DE 28 at 24) is not sufficient to state a claim under ERISA § 502(a)(1)(B). *See Millennium Healthcare of Clifton, LLC v. Aetna Life Ins. Co.*, No 19-12660, 2019 WL 7498667, at *2 (D.N.J. Nov. 15, 2019) ("Plaintiff fail to allege what the relevant provisions of the Patient's Plan state and why such provisions make benefits 'actually due,' as required by ERISA.").

Plaintiffs submit that the Amended Complaint is adequate because it "alleges that the Plan incorporates the WHCRA and its requirement that post-mastectomy breast reconstruction surgical procures be reimbursed." (DE 28 at 24) The WHCRA provides as follows:

> A group health plan, and a health insurance issuer providing health insurance coverage in connection with a group health plan, that provides medical and surgical benefits with respect to a mastectomy shall provide, in a case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for—
>
> (1) all stages of reconstruction of the breast on which the mastectomy has been performed;
> (2) surgery and reconstruction of the other breast to produce a symmetrical appearance; and
> (3) prostheses and physical complications of mastectomy, including lymphedemas;
>
> in a manner determined in consultation with the attending physician and the patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage. Written notice of the availability of such coverage shall be delivered to the participant upon enrollment and annually thereafter.

29 U.S.C. § 1185b(a). WHCRA also prohibits group health plans and health insurance issuers providing coverage in connection with a group health plan to

> (1) deny to a patient eligibility, or continued eligibility, to enroll or to renew coverage under the terms of the plan, solely for the purpose of avoiding the requirements of this section; and
> (2) penalize or otherwise reduce or limit the reimbursement of an attending provider, or provide incentives (monetary or otherwise) to an attending provider, to induce such provider to provide care to an individual participant or beneficiary in a manner inconsistent with this section.

29 U.S.C. §1185b(c). The WHCRA is self-limiting, however; it provides that "[n]othing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section." 29 U.S.C. § 1185b(d).

Plaintiffs contend that the WHCRA prohibits an insurer "from reducing or limiting the reimbursement of an attending provider who performs post-mastectomy breast reconstruction surgery." (DE 28 at 24). Plaintiffs argue that, irrespective of whether a provider is in-network or out-of-network, the WHCRA prohibits reduction of reimbursement for post-mastectomy breast reconstruction surgery. (DE 28 at 12) Plaintiffs do acknowledge that reimbursement may be limited by deductibles, copays, and coinsurance under the terms of the applicable plan. (DE 28 at 25). Plaintiffs also acknowledge that "[t]here may be applicable surgical rules that lower the reimbursement rate, such as the multiple surgery rule and co-surgeon rule." (DE 28 at 24) They state, however, that out-of-network rates are not among the permitted means of limiting reimbursement for post-mastectomy breast reconstruction surgery under the WHCRA. (*See* DE 28 at 24-26; Am. Compl. ¶ 41 ("Under the WHCRA, which is incorporated in every EOC, reimbursement cannot be reduced by applying out-of-network rates. The procedure must be covered and the amounts cannot be reduced.")

The United States Court of Appeals for the Third Circuit has not yet analyzed the language of the WHCRA at issue here. However, the United States

Court of Appeals for the Second Circuit has persuasively held that the WHCRA goes no further than to require that insurers cover post-mastectomy breast reconstruction surgery "in a manner 'consistent' with the policies 'established for other benefits under the plan.'" *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 625 (2d Cir. 2008). In *Krauss,* the breast reconstruction surgery was performed by "two different, unaffiliated doctors, neither of whom was a member of the plan's provider network." *Id.* at 617. The defendant "refused payment for one-fourth of the cost" of the surgery. *Id.* The plaintiff alleged, *inter alia*, that the defendant's "denial of full reimbursement" violated the WHCRA. *Id.* The Second Circuit reasoned that "Congress's reference to 'annual deductibles and coinsurance' was intended to be illustrative, rather than exclusionary," and rejected the plaintiff's argument that the Act "preclude[s] other cost-sharing devices." *Id.* at 626. The Court noted that in enacting the WHCRA, Congress sought "to ensure that women who underwent mastectomies would not be denied coverage for reconstructive surgery on the ground that it was cosmetic." *Id.* However, in seeking to "mak[e] women 'complete' and 'whole' following their mastectomies," Congress did not intend to "require[] insurers to cover 100 percent of the amount billed by the surgeon – whatever that may be – less only applicable deductions and coinsurance provision, regardless of the other terms and conditions of the plan." *Id.* at 626-27. In sum, "Congress was plainly focused on the question of coverage *vel non*; it was not concerned with the precise details of the coverage to be provided." *Id.* at 626-27.

Plaintiffs concede that Defendants provided some coverage for the breast reconstruction surgery (Am. Compl. ¶¶33, 47, 53), but submit that they were improperly under-reimbursed under the WHCRA, the standards of which are deemed to be incorporated in the Plan. (DE 28 at 11-12). That statute, however, does not specify the level of benefits that must be provided. *Krauss,* 517 F.2d at 626-27. Further, there is nothing in the Act that bars the application of lower reimbursement rates for breast reconstruction surgery

performed by out-of-network providers. As the Second Circuit has held, Congress did not mandate 100 percent coverage of such surgeries, irrespective of the other generally applicable terms of the plan. *Id.*

As alleged in the Amended Complaint, the Plan here provided that out-of-network reimbursement rates will be based on the Host plan's non-participating provider fee schedule, unless state or federal law requires otherwise. (Am. Compl. ¶42) Plaintiffs have not established that state or federal law provides otherwise—*i.e.,* prohibits the imposition of those out-of-network rates to the breast reconstruction surgery at issue in this case. Therefore, I find that Plaintiffs have failed to sufficiently state an ERISA claim for improper under-reimbursement.

## III.   Conclusion

For the reasons set forth above, I will grant Defendants' Rule 12(b)(6) motion to dismiss the Amended Complaint for failure to state a claim. This being an initial dismissal, it is entered without prejudice to the submission, within 30 days, of a properly supported motion to amend the complaint.

An appropriate order follows.

Dated: November 30, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

17