**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PRESTIGE INSTITUTE FOR PLASTIC SURGERY, P.C, and KEITH M. BLECHMAN, M.D., P.C., on behalf of PATIENT HG,<br><br>Plaintiffs,<br><br>v.<br><br>KEYSTONE HEALTHPLAN EAST, and BLUE CROSS OF CALIFORNIA d/b/a ANTHEM BLUE CROSS,<br><br>Defendants. | Civ. No. 2:20-cv-00496 (KM) (ESK) |

**SECOND AMENDED COMPLAINT**

By way of this Second Amended Complaint ("SAC"), and to the best of its knowledge, information, and belief, formed upon a reasonable inquiry under the circumstances, Plaintiff Prestige Institute for Plastic Surgery, P.C. ("Prestige") and Keith M. Blechman, M.D., P.C. on behalf of Patient HG ("Blechman") (collectively, "Plaintiffs"), bring this action against Keystone Healthplan East ("Keystone"), and Blue Cross of California, d/b/a Anthem Blue Cross ("Anthem") (together, "Defendants").

1. This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning Defendants' under-reimbursement to Plaintiffs for coverage of post-mastectomy breast reconstruction surgical services.

2. Defendant Anthem was the insurer of the Plan, Che Services (the "Plan"), under which the Patient, HG, was the Plan participant.

3. Patient HG was initially diagnosed with breast cancer. She underwent a bilateral mastectomy. On May 30, 2018, Joseph F. Tamburrino, M.D. and Blechman as co-surgeons

1

performed bilateral breast reconstruction surgery. On November 19, 2018, Dr. Tamburrino performed additional breast reconstruction surgery.

4. Drs. Tamburrino and Blechman did not participate in Defendant's Keystone's network of contracted health care providers.

5. After each of these breast reconstruction surgeries, Plaintiffs submitted invoices in the form of CMS-1500 forms as required to Defendant Keystone for a total amount of $417,125.13. Defendants reimbursed Plaintiff only $17,748.24, leaving an unreimbursed amount of $399,376.89, or 96% of the total amount, for which the Patient remains financially liable.

## JURISDICTION

6. The Court has subject matter jurisdiction over Plaintiff's ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction).

7. The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendants systematically and continuously conduct business in the State of New Jersey, and otherwise have minimum contacts with the State of New Jersey sufficient to establish personal jurisdiction over them.

8. Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) Defendant Keystone has an agent, and transacts business in the District of New Jersey, (b) Anthem has an agent and transacts business in the District of New Jersey; and (c) one Plaintiff has an office and both Plaintiffs practice medicine in the District of New Jersey.

9. Venue is also appropriate under 29 U.S.C. § 1132(e)(2), which requires that an ERISA plan participant (and consequently her assignee) has the right to bring suit where she resides or alleges that the violation of ERISA occurred.

## PARTIES

10. Plaintiff Prestige Institute for Plastic Surgery, P.C., is a physician practice group led by Joseph F. Tamburrino, M.D. Dr. Tamburrino is double-Board-certified in plastic surgery by the American Board of Plastic Surgery and the American Board of Surgery. He received his medical degree from Thomas Jefferson Medical College and completed his residency training in general surgery at Temple University Hospital. He completed his plastic surgery residency at the Cleveland Clinic. He received fellowship training in Reconstructive Microsurgery at UCLA. Plaintiff's office is located in Cherry Hill, New Jersey.

11. Plaintiff Keith M. Blechman, M.D. is a plastic and reconstructive surgeon whose office is located on Park Avenue in New York City. He received his medical degree from New York University School of Medicine and New York University's Institute for Reconstructive Plastic Surgery where he studied stem cell biology application in wound healing and tissue regeneration. He completed a reconstructive microsurgery fellowship at M.D. Anderson Cancer Center.

12. Defendant Keystone Health Plan East is a Health Maintenance Organization ("HMO") owned by Independence Blue Cross ("IBC"). It is located in Philadelphia, Pennsylvania.

13. Defendant Anthem is a health care insurance company with offices located in Los Angeles, California. It is the parent company of Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California. Anthem is the insurer for the Plan.

## FACTUAL ALLEGATIONS

### A.   The Blue Card Program and National Accounts System

14. The Blue Card Program and the National Accounts System, in which each Blue Cross Blue Shield ("BCBS") licensee must participate, including Keystone and Anthem, was the

direct result of the practice of all the BCBS licensees, under the direction of the Blue Cross Blue Shield Association ("BCBSA"), to engage in exclusive geographical market allocation.

15. Under this practice, each BCBS licensee was allocated an exclusive geographic market to offer health insurance. This practice continues today. It will not be substantially changed by the terms of the pending settlement agreement in the Subscriber Track in *In re BCBS Antitrust Litigation* Master File 2:13-cv-20000-RDP (N.D. Ala).

16. Keystone's allocated exclusive market is the county of Philadelphia. It cannot offer health insurance or contract with providers in any adjacent state, although it may contract with providers in contiguous counties. It cannot offer health insurance in California, which is allocated to Anthem.

17. Because Anthem cannot contract with physicians providing services in Pennsylvania, Anthem must look to Keystone's network.

18. These restrictions insulate Keystone and Anthem against competition from each other in their respective exclusive geographic market areas.

19. As part of their mandatory agreement to participate in the Blue Card Program and National Accounts System, Keystone and Anthem committed that other than in contiguous areas (counties adjacent to their allocated geographical market areas), they would not contract, solicit or negotiate with providers outside of their allocated geographical market areas.

20. To make this mandatory agreement work, the BCBSA created Home and Host Plans.

21. The BCBS insurer in the exclusive geographical area through which the member is enrolled is the Home Plan. In this case, it was Anthem. The BCBS insurer located in the exclusive geographical area where the service is provided is referred to as the Host Plan. In this case, it is Keystone.

22. Drs. Tamburrino and Blechman were out-of-network with Keystone. Since Anthem was prohibited from contracting with Drs. Tamburrino and Blechman directly, it was required to rely upon the adequacy of Keystone's network.

23. When out-of-network providers are outside of the Home Plan's exclusive service area, they are considered to be "out-of-area" providers. Drs. Tamburrino and Blechman were out-of-network out-of area providers. Under the Plan, the reimbursement methodology for such providers was distinct from out-of-network in-area providers.

24. Under the Blue Card Program and National Accounts System, Prestige and Blechman were required to and did bill Keystone, not Anthem, since the surgical services were rendered in Pennsylvania. Under the Blue Card Program and National Accounts System, and in this case, Keystone was the agent of Anthem.

### B. The May 30, 2018 Breast Reconstruction

25. On May 30, 2018, Patient HG underwent bilateral breast reconstruction surgery at Doylestown Hospital immediately subsequent to a bilateral mastectomy. Dr. Tamburrino, who was co-surgeon, also performed an internal mammary lymph node biopsy. He received prior authorization from Anthem for this medically necessary procedure.

26. After performing this breast reconstruction surgery, Prestige submitted an invoice on a CMS-1500 form to Defendant Keystone, as required, for $162,344.61. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $2,131.00 |
| S2068-62-LT | $50,000.00 | $1,065.50 |
| 15734-RT | $21,517.08 | $845.55 |
| 15734-LT | $21,517.08 | $313.43 |

5

| | | |
|---|---|---|
| 38530-LT | $7,903.09 | $221.47 |
| 35761-RT | $5,698.68 | $221.47 |
| 35761-LT | $5,698.68 | $221.47 |
| **Total** | **$162,334.61** | **$5,643.97** |

S2068 is a HCPCS Level II Code for a DIEP procedure.  CPT code 15734 is a flap procedure. It is separately compensable. CPT code 38530 is Excision Procedures on the Lymph Nodes. CPT code 35761 is artery and vein repair.  Modifier -62 means co-surgeon.

27. The Deep Inferior Epigastric Perforator Flap ("DIEP") procedure, is a complex microsurgical procedure that is performed only by a small number of reconstruction surgeons in the country who are trained in the technique. It is a microsurgery procedure that uses the abdominal muscle tissue to make a flap that the surgeon uses as the basis for a new breast, and it results in fewer donor site complications than other surgical techniques.

28. Because this surgery is so specialized and complex, it is often only performed by fellowship-trained surgeons. One- and two-year fellowship training is post-residency and beyond Board certification.  Dr. Tamburrino was fellowship-trained at UCLA. Dr. Blechman was fellowship-trained at the M.D. Cancer Center.

29. The DIEP procedure requires two co-surgeons specializing in microsurgery working together.

30. The entire amount that Anthem determined was allowable was $5,643.97, and was applied to the amount of Patient HG's patient liability.  Accordingly, Patient HG was responsible for the full amount of the $162,334.61 billed charge.  Defendants paid nothing for this breast reconstruction surgery.

31. Defendants failed to reimburse Plaintiffs properly under the Plan, in violation of ERISA.

32. Defendants failed to reimburse Plaintiffs based on the out-of-network out-of area reimbursement provision applicable to Plaintiffs under the Plan. Plaintiffs provided the surgical services in Pennsylvania. The Plan was based in California. Plaintiffs were out-of-network out-of area providers with respect to the Plan.

33. Accordingly, the Plan's out-of-network reimbursement provision did not apply. The Plan's special out-of-network out-of area reimbursement provision applied instead. This provision stated:

> When covered services are provided outside of Anthem Blue Cross's Service Area by non-participating providers, we may determine benefits and make payment based on pricing from either the Host Blue or the pricing arrangements required by applicable state or federal law. . . . **Exceptions**. In certain situations, we may use other pricing methods, such as billed charges or the pricing we would use if the healthcare services had been obtained within the Anthem Blue Cross Service Area, or a special negotiated price to determine the amount we will pay for services provided by non-participating providers.

34. There were no negotiations between the parties and therefore there was no negotiated price.

35. Applicable state law required that a plan with a deficient network must reimburse a non-participating provider at the in-network level of benefits.

> A plan shall cover services provided by a nonparticipating health care provider at no less than the in-network level of benefit when the plan has no available network provider. A plan is not required to have network providers available outside of the approved service area for the purposes of enrollees seeking basic health care services while outside of the service area. A plan is not required to pay a noncontracted provider at the same benefit level as a network provider for basic health care services sought by and provided an enrollee while outside the service area when in-network providers were available.

28 Pa. Code § 9.679(k).

36. Upon information and belief, Defendant Keystone's network was deficient with respect to breast reconstruction surgeons qualified to perform the DIEP procedure, and Defendants did not reimburse Plaintiffs at the in-network level of benefits.

37. The Host Blue's reimbursement rates for out-of-network providers were not specified in the Plan, which left the issue ambiguous. The Home Blue's reimbursement rates for out-of-network providers were also not specified other than a "non-participating provider rate," a "fee schedule," "an amount derived from the total charges billed by the non-participating provider," "an amount based on information provided by a third-party vendor," or an amount based on Medicare.

38. However, none of the Defendants stated that they had reimbursed Plaintiffs based on any of these methodologies. In a January 24, 2019 letter, Defendant Anthem stated that the "maximum allowed amount" was determined by the "local plan, Blue Cross Blue Shield of Pennsylvania." There is no such entity. Defendants stated that they paid based on "Amount Allowed by Benefit," which was not a Plan term.

39. Defendants could not have legitimately reimbursed the S2068 HCPCS Level II Code under Medicare because Medicare did not have a reimbursement amount for this code in 2018. The only way that Defendants could have utilized Medicare in this context was to have unilaterally and illegitimately downcoded the HCPCS code actually billed into a CPT code. The HCPCS code was specifically created to represent DIEP surgery and consequently had a higher reimbursement amount. The CPT code represented general breast reconstruction surgery (not DIEP) and had a lower reimbursement level.

40. Defendants failed to reimburse Plaintiffs in accordance with the terms of the Plan. In doing do, Defendants violated ERISA.

41. The Plan terms also require the patient to pay the lower participating provider liability amount when she uses an out-of-network provider at an in-network hospital. The Patient received her surgeries at Doylestown Hospital. Upon information and belief Doylestown Hospital was in-network with Defendant Keystone. Drs. Tamburrino and Blechman did not have the

Patient's consent, if required, that satisfied the criteria stated in the Plan as an exception to this requirement.

42. In addition, Defendants reduced reimbursement for the S2068 and 15734 codes. Plaintiff Prestige, on behalf of Dr. Tamburrino, who was co-surgeon with Dr. Blechman, billed these codes with modifier -62, which indicates a co-surgeon. The co-surgeons operated on different anatomical sites of the patient simultaneously.

43. Defendant Anthem's Co-Surgeon Policy Bulletin states: "It is not considered co-surgery when two surgeons are performing separate procedures on different anatomical sites during the same operative session. Each surgeon is considered the primary surgeon for that specific procedure and will be reimbursed up to 100% of the maximum allowance."

44. In contravention of Defendant Anthem's own Co-Surgeon Policy Bulletin, Defendants reduced the reimbursement amounts.

45. Dr. Tamburrino was co-surgeon with Dr. Blechman. Dr. Tamburrino must be reimbursed at 100% of the applicable Plan benefit amount.

46. The medical literature supports that breast reconstruction surgery procedures should be best performed by two surgeons, and that single-surgeon breast reconstruction had significantly longer operating room time, and higher wound occurrences that required surgical correction. N. Haddock, "Co-Surgeons in Breast Reconstructive Microsurgery," *J. Microsurgery*, 2018: Jan; 38(1); 14-20. Another study found that operative time and length of stay were both significantly lower when a co-surgeon or assistant surgeon was present. AJ Bauermeister, "Impact of Continuous Two-Team Approach in Autologous Breast Reconstruction," *J. Reconstr. Microsurg.*, 2017; May; 33(4); 298-304.

47. Further studies found identical results, concluding: "The use of two operating surgeons has demonstrable effects on the outcomes of microsurgical breast reconstruction. The

addition of a second surgeon significantly decreases operating room time and shortens hospital length of stay in both unilateral and bilateral reconstruction. It also significantly decreases donor-site wound healing complications." K.E. Weichman, "The Impact of Two Operating Surgeons on Microsurgical Breast Reconstruction," *Plast. Reconstr. Surg.*, 2017 Feb.; 139(2); 277-284; S.N. Razdan, "The Impact of the Cosurgeon Model on Bilateral Autologous Breast Reconstruction," J. Reconstr. Microsurg. 2017; 33(09); 624-629.

48.     A study specific to the DIEP surgical procedure came to the identical conclusion. O. Canizares, "Optimizing Efficiency in Deep Inferior Epigastic Perforator Flap Breast Reconstruction," *Ann. Plast. Surg.*, 2015 Aug.; 75(2); 186-92.

49.     Defendants also applied the multiple surgery rule for each separately compensable surgical procedure for the left and right breasts. Bilateral procedures coded as -RT and -LT (right and left) must be reimbursed as separate and independent surgical procedures.

50.     Even if such procedures are reimbursed based on the multiple surgery rule, bilateral surgery must be reimbursed at 150%. According to the Anthem Professional Reimbursement Policy specific to Multiple and Bilateral Surgery Processing, where "one line with modifier LT and a second line with modifier RT, same procedure code – each line will be eligible at 75% of the amount applicable for such procedure code."

51.     Defendants failed to reimburse Plaintiffs according to the Anthem Bilateral Surgery Processing policy, and paid a lower reimbursement amount.

52.     Prestige filed a first-level appeal concerning the amount of Defendants' reimbursement of Prestige's bill on December 18, 2018.

53.     Defendant Anthem denied this appeal in a letter dated January 15, 2019. It stated that the "maximum allowable amount" was determined by the local plan and was applied to the member's deductible.

54. The Plan specified no required levels of appeal. Consequently, Prestige exhausted the Patient's administrative remedies or, alternatively, there were no administrative remedies to exhaust.

55. Nonetheless, On March 18, 2019, Plaintiff filed another appeal concerning the amount of Defendant's reimbursement of Prestige's bill.

56. Anthem denied this appeal on May 15, 2019. It reiterated that it had paid the maximum allowable amount as the provider was out-of-network and no additional benefits were due.

57. After performing the May 30, 2018 breast reconstruction surgery as co-surgeon with Dr. Tamburrino, Dr. Blechman submitted an invoice on a CMS-1500 form to Defendant Keystone, as required, for $174,200.00. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $0.00 |
| S2068-62-LT | $50,000.00 | $3,039.25 |
| 15734-RT | $30,000.00 | $0.00 |
| 15734-LT | $30,000.00 | $0.00 |
| 38530-LT | $3,000.00 | $58.03 |
| 35761-RT | $5,600.00 | $0.00 |
| 35761-LT | $5,600.00 | $122.91 |
| **Total** | **$174,200.00** | **$3,220.19** |

58. The EOB stated: "This is the amount that exceeds the maximum allowed amount." Defendants did not explain or describe the definition of "maximum allowed amount," in violation of ERISA.

59. Defendants failed to reimburse Plaintiffs based on the out-of-network out-of area reimbursement provision under the Plan applicable to Plaintiffs. Defendants stated that they paid based on "Amount Allowed by Benefit," which was not a Plan term. Defendants also illegitimately reimbursed Dr. Blechman based on co-surgeon and bilateral surgery rules that did not represent Defendant Anthem's policies.

60. Blechman filed a first-level appeal concerning the amount of Defendants' reimbursement of his bill on April 18, 2019. Defendants paid an additional amount of $3,220.10 but otherwise upheld its processing of the bill.

61. The decision highlights the arbitrary and capricious nature of Defendants' determinations, since Prestige and Blechman billed for the same CPT codes and performed the same surgical procedures as co-surgeons. Yet, Defendants were paid different amounts, and Dr. Blechman received an additional payment.

62. Because the Plan had no required levels of appeal, Bechman exhausted the Patient's administrative remedies or, alternatively, there were no administrative remedies to exhaust.

### C. November 19, 2018 Breast Reconstruction

63. On November 19, 2018, Dr. Tamburrino performed additional breast reconstruction procedures on Patient HG as part of the continuation of care: fat grafting to shape the breasts, bilateral nipple-areolar reconstruction, and surgical repair of the abdominal donor site.

64. Prestige submitted an invoice on a CMS-1500 form, as required, for $80,590.51. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| 14301 | $15,431.91 | $979.28 |
| 19350-LT | $11,834.81 | $747.33 |
| 19350-RT | $11,834.81 | $747.33 |

| | | |
|---|---|---|
| 19380-LT | $11,089.91 | $859.44 |
| 19380-RT | $11,089.91 | $859.44 |
| 15770-LT | $9,654.58 | $735.58 |
| 15770-RT | $9,654.58 | $735.58 |
| **Total** | **$80,590.51** | **$5,663.98** |

CPT code 14301 is Adjacent Tissue Transfer or Rearrangement Procedures on the Integumentary (Skin) System. CPT code 19350 is breast reconstruction. CPT code 19380 is revising an already reconstructed breast. CPT code 15770 is Flaps and Grafts Procedures.

65. The entire amount that Anthem paid was applied to the amount of Patient HG's patient liability. Accordingly, Patient HG was responsible for the full amount of the $80,590.51 billed charge, just as she was for Dr. Tamburrino's charge for the first-stage breast surgery.

66. Defendants failed to reimburse Dr. Tamburrino based on the Plan's special out-of-network out-of area reimbursement provision. These reimbursement amounts are even lower than the Medicare fee schedule amounts.

67. Defendants did not reduce reimbursement for the bilateral procedures based on multiple procedure or other rules. It thereby conceded that it should not have reduced reimbursement for the bilateral procedures performed during the May 30, 2018 surgery.

68. Prestige filed a first-level appeal concerning its under-reimbursement on May 23, 2019. It sent a second-level appeal on October 23, 2019. The appeals were denied on the basis that no authorization form was included. The basis for the denials was erroneous on its face because the appeal letters did include an Assignment of Benefits form. Prestige exhausted its administrative remedies or, because the Plan had no required levels of appeal, there were no administrative remedies to exhaust.

69. Defendants' misapplication of the Plan's benefits rendered the Plan's policy of insurance for breast reconstruction illusory. An insurance policy is illusory where it would not pay benefits under any reasonably expected set of circumstances. Post-mastectomy breast reconstruction surgery is complex and expensive by nature. It is most often at least a two-stage procedure (as in this case).

70. Defendants paid $17,748.24 of the $417,125.13 charged amount, leaving an unreimbursed amount of fully $399,376.89 as the Patient's financial liability. Paying 4% of an insured amount (even including deductibles) is not a reasonable expectation under any set of circumstances. For example, for the first-stage breast reconstruction billed by Prestige, Defendants indicated their allowed amount was $5,643.97 but then indicated that the patient's deductible was also $5,643.97, resulting in the payment of $0 on a billed amount of $162,334.61. For Dr. Blechman, Defendants paid $3,220.19 on a billed amount of $174,200.00, representing a payment of less than 2% of the insured amount. Defendants' payment transformed the Plan into an illusory plan.

71. Patient HG assigned her payments to Tamburrino. The Assignment stated, in pertinent part:

> I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any payments) under my health insurance policy or benefit plan to Dr. Joseph Tamburrino . . . with respect to . . . bring any appeal, lawsuit, or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination of benefits under any insurance policy or benefit plan.

72. Patient HG assigned her payments to Blechman. The Assignment stated, in pertinent part:

> I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any payments) under my health insurance policy or benefit plan to Keith M. Blechman [and] Dr. Keith M. Blechman, M.D., P.C. . . . with respect to . . . bring any appeal, lawsuit, or

administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination of benefits under any insurance policy or benefit plan.

73. The Plan's anti-assignment provision contains an exception under the circumstances pertaining to the services in this case.

74. The assignment language in the Plan states as follows:

Any assignment of benefits, even if assignment includes the providers [sic] right to receive payment, is generally void. *However, there are certain situations in which an assignment of benefits is permitted.* For example, if you go to a participating provider that is a hospital or facility at which, or as a result of which, you receive covered non-emergency services from a non-participating provider . . . an assignment of benefits to such non-participating provider will be permitted.

75. Doylestown Hospital, where the breast reconstruction surgeries were performed, was, on information and belief, in Keystone's network of hospitals and therefore was a participating hospital. Since the breast reconstruction procedures were covered on a non-emergency basis, under the Plan terms assignment was permitted.

76. Breast reconstruction was a covered service under Patient HG's Plan. The coverage terms are found under "Reconstructive Surgery," which states that reconstructive surgery is covered. "This includes surgery performed to restore and achieve symmetry following a medically necessary mastectomy." It is also found under "Breast Cancer," which states that the Plan provides coverage for "Reconstructive surgery of both breasts performed to restore and achieve symmetry following a medically necessary mastectomy."

77. Defendants' decision to assess the patient $399,376.89 in out-of-pocket costs for breast reconstruction surgeries that must be covered was not a coverage decision. It was, instead, a decision forcing the patient to self-insure her own breast reconstruction surgery, in violation of the Plan terms.

## COUNT I

### CLAIM AGAINST DEFENDANT KEYSTONE FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

78. Defendant Keystone is obligated to pay benefits to the Plan participant in accordance with the terms of the Plan, and in accordance with ERISA. This obligation arises under the Blue Card Program and National Accounts System, and under ERISA.

79. Defendant Keystone violated its legal obligations under this ERISA-governed Plan when it, together with Anthem and as its agent, under-reimbursed Plaintiffs for breast reconstruction surgeries provided to Patient HG by Plaintiffs, in violation of the terms of the Plan and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

80. Plaintiffs submitted invoices to Defendant Keystone for $417,125.13.

81. Defendant Keystone together with Defendant Anthem determined that the Allowed Amount was $17,748.24, leaving an under-reimbursed amount of $399,376.89. Defendant thereby reimbursed 4% of the total amount.

82. Plaintiffs were required to bill all amounts directly to Keystone.

83. Defendant Keystone acted as Defendant Anthem's agent under the Blue Card Program and National Accounts System.

84. Plaintiffs seek unpaid benefits and statutory interest back to the date Plaintiffs' claims were originally submitted to Defendant Keystone. They also seek attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Keystone.

## COUNT II

### CLAIM AGAINST DEFENDANT ANTHEM FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

85. Defendant Anthem is obligated to pay benefits to the Plan participant in accordance with the terms of the Plan, and in accordance with ERISA. This obligation arises under the Blue Card Program and National Accounts System, and under ERISA.

86. Defendant Anthem violated its legal obligations under the Plan when it, together with Keystone, under-reimbursed Plaintiffs for breast reconstruction surgeries provided to Patient HG by Plaintiffs, in violation of the terms of the Plan and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

87. Defendant Anthem together with Defendant Keystone determined that the Allowed Amount was $17,748.24, leaving an under-reimbursed amount of $399,376.89. Defendant thereby reimbursed 4% of the total amount.

88. Plaintiffs seek unpaid benefits and statutory interest back to the date Plaintiffs' claims were originally submitted to Defendant Keystone. They also seek attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Anthem.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

    (a)    Ordering Defendants to recalculate and issue unpaid benefits to Plaintiffs;

    (b)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees under ERISA, and costs and expenses in amounts to be determined by the Court;

    (c)    Awarding prejudgment interest; and

    (d)    Granting such other and further relief as is just and proper.

Dated: May 14, 2021

/s/ Michael F. Fried
AXELROD LLP
354 North Fourth Avenue
Highland Park, NJ 08904
(732) 718-6171
mfried@axelrodllp.com

Robert J. Axelrod
*Admitted pro hac vice*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
(646) 448-5263
rjaxelrod@axelrodllp.com

Leslie S. Howard
COHEN HOWARD LLP
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
(732) 747-5202
lhoward@cohenhoward.com

*Attorneys for Prestige Institute for Plastic Surgery, P.C. and Keith M. Blechman, M.D., P.C. on behalf of Patient HG*